UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

ARTHUR DAHODA AND MARY A. DAHODA,

                 Plaintiffs,

      v.               1:99-CV-01272

SWITCHES INC., JOHN DEERE CO. AND DEERE & CO.,

                 Defendants,
_____

APPEARANCES:           OF COUNSEL:

FINKELSTEIN, LEVINE,       ELEANOR L. POLIMENI, ESQ.
GITTELSOHN & PARTNERS      JAMES SHUTTLEWORTH, III., ESQ.
Attorneys for Plaintiffs
436 Robinson Avenue
Newburgh, NY 12550

ROCHE, CORRIGAN        ROBERT P. ROCHE, ESQ.
McCOY & BUSH
Attorneys for Defendant
SWITCHES, INC.
36 South Pearl Street
Albany, NY 12207

FRIEDMAN BABCOCK        HAROLD FRIEDMAN, ESQ.
& GAYTHWAITE          EVAN SMITH, ESQ.
Attorneys for Defendants       MARTHA C. GAYTHWAITE, ESQ.
John Deere Co. and          PETER D. FITZGERALD, ESQ.
Deere & Company
6 City Center
P.O. Box 4726
Portland, ME 04112-4726

HOWARD G. MUNSON, SR. J.


**MEMORANDUM DECISION AND ORDER**

**BACKGROUND**

  This case centers on the injuries suffered by plaintiff, Arthur Dahoda, while operating

his riding John Deere Model 175 riding lawn tractor manufactured by defendants John Deere Company and Deere & Company ("Deere"). Plaintiff brings his claims against Deere for negligence, breach of warranty, and strict liability. His wife, plaintiff Mary Dahoda, asserts a claim for loss of consortium. Plaintiffs allege that the lawn tractor was defective and caused an accident resulting in serious injuries to Mr. Dahoda's hand.

Plaintiff Arthur Dahoda purchased the lawn tractor in 1991. Among the safety features included in the lawn tractor was an Operator Presence Control System ("OPC"), which would cut off power to the mower blades if the operator left the lawn tractor seat with these blades engaged. This mechanism is referred to as a deadman's switch or a seat or kill switch.

At the time he purchased the lawn tractor, plaintiff was given an Operator's Manual containing safety and operating instructions. The lawn tractor was also expressly warranted for two years after its purchase date.

During the period 1991 - 1996, plaintiff Arthur Dahoda undertook the required maintenance and repairs for the lawn tractor personally, or by bringing it to a lawn tractor repair shop. In 1993 and 1995 he replaced its lawn cutting blades and its Power Take Off ("PTO") switch.

After acquiring the lawn tractor plaintiff Arthur Dahoda used the lawn tractor to mow his own lawn as well as the lawns of eight commercial accounts he serviced. On September 3, 1996, while he was mowing the lawn of his commercial account, Dutch Touch Florist Shop, the lawn tractor overturned   As a result of this mishap, plaintiff's hand was severely cut with one finger being completely severed , and a partial loss of a second finger. Plaintiff's lawn tractor was equipped with an Operator Presence Control switch ("OPC"). Plaintiff alleges that the

accident took place because the lawn tractor's OPC system malfunctioned, and failed to disengage the power supply to the mowing deck/mower blades when he lost contact with the lawn tractor's operator's seat.

Following the accident, the lawn tractor was transported by plaintiffs' relative back to their home. Some differences exist in the testimony regarding whether it was ever used again. In his deposition testimony at pp. 82,83, plaintiff Arthur Dahoda, stated that the lawn tractor was used once or twice again by his brother John, however, John Dahoda testified in his deposition at p.8, that he never used plaintiffs' lawn tractor after his brother's accident.

Shortly afer the accident, plaintiffs acquired legal representation in this matter, and retained liability expert, Edward Dina, to assist them and counsel in their personal injury case against defendants. On November 29, 1996, plaintiff Arthur Dahoda transported the lawn tractor to Milton, NY in his pick up truck so it could be examined by expert Dina. Defendants were not notified that this examination was to take place. Plaintiffs counsel directed Dina to remove the OPC seat switch as well as the brackets and other parts connected to the OPC seat switch into the lawn tractor.

Dina removed the bracket and seat switch by unbolting the bracket to which the seat switch was still attached, and disconnecting the wire connector attached to the seat switch. Before the bracket and disconnected wire connector were removed, the bracket was securely bolted to the tractor, the seat switch was securely attached to the bracket, and the wire connector securely attached to the seat switch. There did not appear to be anything improper in the manner in which these components were installed and connected in the tractor that would have contributed to the intermittent functioning of the seat switch. (Dina, Aff. p. 2)

Dina first took photographs of the lawn tractor in the bed of the plaintiffs' pickup truck, which showed how the seat switch, brackets and wire connector were installed on the tractor, and made a short videotape of the tractor. (Pltfs. Statement of Material Facts p.7).

Prior to removing the parts, Dina first tested the safety system to see if it was working. In this test, he sat on the mower tractor's seat, started the motor, engaged the PTO, and sat up off the seat. The tractor kept running and the blades were still engaged. The tractor motor was then shut off. To determine if the seat switch was working properly, Dina used a continuity meter to test the seat switch's electricity flow consistency by manually operating it by pushing down on the seat with his hands. Several continuity tests showed that continuity was intermittent. This could possibly lead to a malfunction preventing the mower blades from stopping in an accident situation within the established industry standard of a five second time frame for the blades to stop rotating after power is shut off. (Dina, Aff. p.2). When plaintiffs' other experts, Jack Arfstrom and Everet Johnson, later inspected the OCP switch with their continuity meters, they each indicated intermittent operation of the electrical contacts inside the switch. The OCP switch was not installed on plaintiffs' lawn tractor when these tests were made.

Plaintiffs did not notify defendant that the accident had taken place until January 21, 1998, nearly 1-1/2 years after the accident occurred. Defendants responded to this letter in a letter dated February 9, 1998, asking that plaintiffs' counsel provide the particulars of the accident, the identity of the lawn tractor's owner, and where the machine was then located.

Plaintiff's counsel responded to defendants' in a letter dated February 18, 1998, furnishing details of the accident's occurrence, advising defendants of the theories of the case

that counsel was investigating, that the seat switch was with plaintiffs' expert in Kansas for non-destructive testing, that the lawn tractor was secure at plaintiffs' residence, that they acknowledged their obligation to permit defendants to have access to the parts and the lawn tractor, and assured defendants that there would be no destructive testing without advance notification.

Defendants' followed it with a letter to plaintiffs' counsel dated March 9, 1998, stating that its letter had raised significant concerns to them regarding the entire issue of evidence associated with the case. When defendants' representatives were able to inspect the lawn tractor on June 8, 1998, the OPC switch had been removed as were the brackets and other parts that connected the devise to the machine. The lawn tractor was not in a condition where it could be started or operated, and plaintiffs did not produce the OPC switch for examination.

In a letter dated June 22, 1998, defendants' representative, Steven J. Davis stated, "I understand that there were no destructive tests performed on the switch so it should be available for re-connection and further inspection of the switch and any problem with it may be identified." The letter also contained recommendations concerning how the lawn tractor could be made runable for a further inspection.

Defendants made two letter requests in October, and one in November asking plaintiffs to produce the OCP switch for inspection. It was only produced after Magistrate Judge Homer issued an order of December 9, 1999, ordering plaintiffs to do so.

Upon obtaining the OCP switch, defendants installed it in an exemplar model 175 lawn tractor and the OCP switch operated approximately 100 consecutive times when properly installed on the model 175 lawn tractor. Plaintiffs contest the validity of defendants' tests of the

OCP switch because they did not test it in a manner in which the OPC switch is alleged to have failed at the time of the accident.

Currently pending before the court are defendants' two motions, one for summary judgment pursuant to Rule 56 of the Fed.R.Civ.P., the other, pursuant to Rule 7(b)(1) of the Fed.R.Civ.P., and Local Rule 7.1(a), to strike the testimony, support papers and report of plaintiff's third liability expert, Alden P. Gaudreau, from plaintiffs' papers submitted in opposition to defendants' summary judgment motion. Plaintiffs have entered opposition to defendants' two motions and, also, have cross moved under Rule 7(b)(1), for leave to call expert Gaudreau to testify at trial during plaintiffs' case in chief. Defendants have opposed plaintiffs' cross motion.

The complaint sets forth claims against the defendants for negligence, breach of warranty and strict liability. In his affidavit opposing defendants' motion for summary judgment, plaintiffs' counsel, Steven Lim, Esq., states that plaintiffs will not oppose that portion of defendants' summary judgment motion concerning plaintiffs' claims for breach of warranty. (Lim Aff. p. 2 ¶ 3).

Plaintiffs brought suit against Switches, Inc., John Deere Company and Deere & Company in the New York Supreme Court, Saratoga County, on July 16, 1999. The action was removed to the United States District Court for the Northern District of New York on the basis of complete diversity on August 12, 1999. In a Stipulation filed November 21, 2000, the parties in the instant action discontinued it without prejudice as against defendant Switches, Inc.

**DISCUSSION**

The standard for summary judgment is well-settled. Rule 56 allows for summary judgment where the evidence demonstrates that "there is no genuine issue of any material fact and the moving party is entitled to judgment as a matter of law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986). Summary judgment is properly regarded as an integral part of the Federal Rules as a whole, which are designed "to secure the just, speedy and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 326, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1991) (quoting Fed.R.Civ.P. 1). A court may grant a motion for summary judgment when the moving party carries its burden of showing that no triable issues of fact exist. *See* Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990). In light of this burden, any inferences to be drawn from the facts must be viewed in the light most favorable to the non-moving party. Id.; United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S. Ct. 993, 994, 8 L. Ed. 2d 176 (1962) (per curiam). If the moving party meets its burden, the burden shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). To defeat a motion for summary judgment, however, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). A dispute regarding a material fact is genuine "if evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510. When reasonable minds could not differ as to the import of the evidence, then summary judgment is proper. Anderson, 477 U.S. at 250-251, 106 S. Ct. at 2511.

Defendants primary contention is that summary judgment is appropriate as a sanction for plaintiffs' spoliation of this crucial evidence. They argue that plaintiffs' actions prevented them from determining whether the OPC switch had been connected or installed properly, and whether it had been maintained and properly serviced. They also argue that plaintiffs' claims are time-barred and that plaintiffs cannot establish causation.

Plaintiffs respond that no such spoliation occurred and that, in any event, dismissal is far too harsh a sanction under the circumstances. In addition, the parties dispute the propriety of plaintiffs' use of Alden P. Gadreau as a witness. Magistrate Judge David R. Homer has already precluded plaintiffs' use of Gadreau as a witness during their case-in-chief but allowed for his use as a rebuttal witness to the extent that his testimony is offered as rebuttal to testimony offered by defendants during their case-in-chief.

Under the doctrine announced in Erie R.R. v. Tompkins, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938), federal courts sitting in diversity apply state substantive law and federal procedural law. Gasperini v. Center for Humanities, Inc., 518 U.S. 415, 427, 116 S. Ct. 2211, 135 L. Ed.2d 659 (1996). Classifying a rule as substantive or procedural is sometimes a subtle undertaking. Id. But where the matter in question is one covered by the Federal Rules of Civil Procedure, "it is settled that ... the Federal Rule applies regardless of contrary state law." Id. at 427 n. 7, 116 S. Ct. 2211.

The duty to preserve material evidence arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation. Kronisch v. United States, 150 F.3d 112, 126 (2d Cir.1998). A party to a lawsuit is obligated to preserve any evidence relevant to that suit. A

failure to do so results in spoliation of the evidence. In <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d 776, 779 (2d Cir. 1999), the Second Circuit defined spoliation as "the destruction or significant alteration of evidence or the failure to preserve property for another's use as evidence in a pending or reasonably foreseeable litigation."

"[O]utright dismissal of a lawsuit ... is within the court's discretion." Id. <u>Chambers v. NASCO, Inc.</u>, 501 U.S. 32, 45, 111 S. Ct 2123, 115 L. Ed2d 27 (1991). Dismissal is proper if there is "a showing of willfulness, bad faith, or fault on the part of the sanctioned party." <u>West v. Goodyear Tire & Rubber Co.</u>, 167 F.3d at 779 (citing <u>Jones v. NFTA</u>, 836 F.2d 731, 734 (2d Cir.1987)). Dismissal is not limited only to matters where the offending party has acted with bad faith or willful intent, but is permitted where there is any fault of the sanctioned party. <u>Bobal v. Rensselaer Polytechnic Institute</u>, 916 F.2d 759, 764 (2d Cir.1990), *cert. denied*, 499 U.S. 943, 111 S. Ct. 1404, 113 L. Ed.2d 459 (1991).

As the Supreme Court has noted, "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." <u>National Hockey League v. Metropolitan Hockey Club, Inc.</u>, 427 U.S. 639, 643, 96 S. Ct. 2778, 2781, 49 L. Ed.2d 747 (1976) (*per curiam*); <u>Jones v. Niagara Frontier Transportation Authority</u>, 836 F.2d 731, 735 (2d Cir.1987) ("in this day of burgeoning, costly and protracted litigation courts should not shrink from imposing harsh sanctions where ... they are clearly warranted"), *cert. denied*, 488 U.S. 825, 109 S. Ct. 74, 102 L. Ed.2d 50 (1988).

The court's power to impose sanctions is derived generally from Fed. R. Civ. P. 37 and

the court's "inherent power to regulate litigation, preserve and protect the integrity of the proceedings before it, and sanction parties for abusive practices." Shamis v. Ambassador Factor Corp., 34 F. Supp.2d 879, 888 (S.D.N.Y. 1999). The court has at its disposal a wide range of sanctions to level the playing field and punish the improper conduct. Available sanctions include ordering dismissal of the culpable party's suit, granting summary judgment in favor of the prejudiced party, precluding the culpable party from giving testimony regarding the destroyed evidence, or giving an adverse inference instruction to the jury against the culpable party. *See* Rutgerswerke AG and Frendo S.p.A. v. Abex Corp., 2002 WL 1203836 at *12 (S.D.N.Y. June 4, 2002).

In determining an appropriate sanction, the court must consider whether the party accused of spoliation had a duty to preserve the evidence in question, whether the party acted willfully, negligently, or in bad faith, and the degree of prejudice inflicted upon the party seeking the discovery as a result of the spoliation in issue. *See* W.R. Grace & Co.--Conn. v. Zotos Intern., Inc., 2000 WL 1843258 at *10 (W.D.N.Y. November 2, 2000). The court should fashion a sanction to: "(1) deter parties from engaging in spoliation; (2) place the risk of an erroneous judgment on the party who wrongfully created the risk; and, (3) restore 'the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party.'" West, 167 F. 3d at 779 (quoting Kronisch v. United States, 150 F. 3d 1(2d Cir. 1998)).

In the case at bar, plaintiffs' counsel had a duty to preserve the evidence in question. Undoubtedly, the plaintiffs were aware that a lawsuit was forthcoming. They retained counsel shortly after the accident, and engaged expert Edward Dina to assist in the legal proceedings,

conduct the examination of the lawn tractor and remove the OPC switch system. They were obtaining evidence to sustain a personal injury claim, and knew the identity of the tractor mower manufacturer. It would not have been difficult for them or their counsel to notify defendants regarding the accident and their intent to alter the evidence, but they chose not to do so.

Within three months of the accident date, plaintiff's counsel had an expert examine the tractor mower and remove the critical parts therefrom. When defendants were notified of the accident until 1 ½ years later, and that the seat switch and its connective parts were with plaintiffs' expert in Kansas for non-destructive testing, defendants quickly advised plaintiffs' counsel that they had significant concerns regarding the entire issue of evidence associated with the case.

In order to develop defenses, the defendants sought immediate examination of the tractor mower in the condition it was in at the time of the accident.

Plaintiffs' attorneys made the tractor available for defendants' inspection in June 1998. It was not in a condition where it could be started or operated in order to test it for certain aspects. The battery was dead, the fuel system may have become contaminated, and, more importantly, the OPC switch was neither connected to the lawn tractor or even present at the site.

Defendants then requested that the tractor, in operable condition with the OPC switch installed, be made available for plaintiff's inspection. In spite of several more requests to examine these critical pieces of evidence as requested, the plaintiffs' lawn tractor was not produced in operable condition, nor was the OPC switch produced until its production was ordered by the court. When defendants did receive the OPC switch and tested it, properly

11

installed on a lawn tractor model the same as plaintiffs, it consistently worked as intended.

The situation in this case is similar to the one in Beers v. General Motors Corporation, 1999 WL 325378 (N.D.N.Y. May 17, 1999).  There, a blade on an improperly installed fan on a truck engine broke off and injured the plaintiff.  While inspecting the fan, plaintiffs' expert disassembled it which irreparably altered it from its condition at the time of the accident.  Additionally, plaintiff's counsel never notified defendant that the OPC switch was  was to be removed from the lawn tractor.  The possibility that the OPC switch may have failed due to prior damage was defendant's primary defense, and since its condition at the time of the accident could never be duplicated, defendant's expert would not be able to effectively give such an opinion. Id. at p. 1.

Dismissal is a drastic remedy and should be imposed only after consideration of alternative, less drastic sanctions.  West, 167 F.3d at 779. The Second Circuit has also directed, however, that in fashioning a sanction, the district court must take into account the ability of the sanction to "restore the prejudiced party to the same position he would have been in absent the wrongful destruction of evidence by the opposing party." Id.  In this case, the only expert who examined the tractor mower and OPC switch as connected at the time of the accident was plaintiff's expert, Edward Dina, upon whose testimony defendants would  be reluctant to rely.  Furthermore, plaintiffs' second liability expert, Everett Johnson, conceded in his deposition testimony,  that plaintiffs' lawn tractor was in altered condition and that it would have been beneficial to him if he could have inspected and tested the OPC switch when it was still installed in the lawn tractor.  (Johnson Dep. p 18).

Even if the court did impose lesser sanctions, they would not likely remedy the wrong

defendants have suffered. The defense in this lawsuit centers on the operation of the OPC switch, its pre-accident maintenance, whether the OPC switch may have been bypassed or tampered with before the accident, and did the accident damage the OPC switch system. As defendants never had the opportunity to inspect the lawn tractor and OSC switch as near the condition it was at the time of the accident, defendants do not even know what sanctions they want the court to impose because they will never know what defenses an inspection may have revealed. A lesser sanction is thus inappropriate as it does not cure the prejudice to defendants.

Having considered the alternatives to dismissal, no other remedy than dismissal appears appropriate. Only dismissal serves the three prongs the West panel enumerated as to the purposes of Rule 37 and spoliation. First, it will serve as a deterrent to plaintiffs' counsel, his expert and non-parties from engaging in spoliation. Second, the risk of an erroneous judgment will be on the party to lose the critical evidence. Third, it appears no other sanction will restore defendants to the position they would have been in absent the spoliation.

Accordingly, defendants' motion for summary judgment is **GRANTED** and the complaint is **DISMISSED**; defendants' motion to strike the testimony, support papers and report of plaintiffs' third liability expert, Alden P. Gaudreau, and plaintiffs' cross motion to call Alden P. Gaudreau to testify at trial during plaintiff's case in chief are both **DENIED** as moot.

**IT IS SO ORDERED**

Dated: December 30, 2005
      Syracuse, New York

*/s/ Howard G. Munson*
Howard G. Munson
Senior U.S. District Judge